UNITED STATES of America,
Plaintiff–Appellee,

v.

Edward Keith HOWICK, Defendant–
Appellant.

No. 00–30243.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 8, 2001

Filed Sept. 4, 2001

John P. Rhodes, Assistant Federal Defender, Federal Defenders of Montana, Missoula, Montana, for the defendant-appellant.

Kris A. McLean, Assistant United States Attorney, United States Attorney's Office, Missoula, Montanta, for the plaintiff-appellee.

Before: LAY,* TROTT and BERZON, Circuit Judges.

BERZON, Circuit Judge:

Edward Howick appeals his jury convictions of possession of counterfeit currency, possession of fictitious documents, and bringing counterfeit currency into the United States. We affirm.[1]

## I.

### A. *Discovery and Delivery of the Unlawful Instruments*

In 1999, a Customs Inspector in Anchorage, Alaska intercepted a suspicious package entrusted to Federal Express for delivery. Addressed to defendant Howick at his Bozeman, Montana residence, the package had been sent from the Phillippines by one Fred Pfahl. According to the attached manifest, the contents of the package were "legal documents." As we develop later, "illegal documents" would have been more like it. Inside were counterfeit gold and silver certificates,[2] fictitious Series 1935 Federal Reserve notes,[3]

---

\* The Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

**1.** Howick also appeals the district court's method of calculating the loss that Howick intended to cause by his crimes, a figure that may affect base offense levels pursuant to U.S.S.G. § 2F1.1(b)(1). Howick argues that the intended loss should have been calculated according to the "economic reality" theory, a claim that he concedes is foreclosed by our decision in *United States v. Koenig*, 952 F.2d 267 (9th Cir.1991). We reject Howick's argument, but note that he has raised it in order to preserve the issue for further review.

**2.** Gold certificates were issued by the U.S. Treasury Department from 1865 until 1933 in exchange for gold coin and bullion. Silver certificates were issued in exchange for silver dollars from 1878 until 1963, when the first one-dollar Federal Reserve notes were introduced.

**3.** Federal Reserve notes, the only paper currency still issued, are the familiar $1, $2, $5, $10, $20, $50, and $100 bills. Notes in denominations of $500, $1,000, $5,000, and

a packet of fictitious "Tiger Zebra" bonds, and other contrived obligations.

At the behest of the Secret Service, a Federal Express employee phoned Howick to confirm that the package would be arriving soon. Using a vehicle and uniform provided by Federal Express, Secret Service agent Kal Bedford then delivered the package to Howick, who volunteered that he had been expecting it.

Bedford returned to Howick's residence shortly thereafter, having exchanged his Federal Express regalia for a federal search warrant. While Bedford and other agents performed a security sweep of the premises, Special Agent Timothy Christine remained with Howick. After affirmatively waiving his *Miranda* rights, Howick discussed matters relating to the phony currency with Christine and later with Bedford.

### B. *Howick's Statement*

In those discussions, Howick admitted that a number of financial documents were present in his home, but offered an innocent explanation for them. He claimed that the materials purporting to be United States obligations came from two sources: Fred Pfahl, in the Philippines, and Clyde Beverly, a resident of Oklahoma for whom Howick, a licensed attorney, had previously done legal work. Howick's tale of how those individuals, and later Howick himself, came to be in possession of what turned out to be in excess of eighteen-billion dollars of bogus financial instruments was set forth in a typed statement prepared by Howick while his house was being searched.

Howick asserted in the statement that he had been recruited for "this project" by Beverly, who claimed to have information on a large amount of currency discovered

aboard United States military aircraft that had crash-landed in the Phillippines decades earlier. Also found on the aircraft, reportedly, were the skeletal remains of eight men, their dog tags, and approximately 50 containers marked "U–235 007," possibly referring to the U–235 isotope, of which fissionable uranium is comprised. Howick's role in the project, he explained, was to attempt to authenticate the putative obligations, with the eventual aim of repatriating them-for a fee, of course.

Toward that end, Howick contacted the offices of two elected federal officials from Utah to enlist their aid in the authentication process. After discussing the matter with the Secret Service, the office of Senator Robert Bennett informed Howick that the documents were apparently phony, a conclusion Howick chose to accept. Howick also contacted certain private parties regarding the putative financial instruments, including his "associate," Joe Wersal. "Although it was suggested that Joe tried to arrange some method of using them," Howick wrote in his statement, "it was always the intent that each material be thoroughly authenticated before anything was done with it."

As for his own views on the documents' authenticity, Howick conceded in his written statement that one piece of currency, supposedly decades old, "raised questions" because it showed an oversized portrait of Benjamin Franklin, a 1996 design innovation in United States currency. According to Agent Christine, Howick also conceded that certain silver certificates in his possession were "obviously false." At the same time, Howick maintained in his statement that he was "aware of no illegal activity on the part of anyone involved in this matter."

---

$10,000 have not been printed since 1946, and have not been distributed since 1969. The "Series date" of paper currency is not the

calendar year in which the currency was printed but rather the last year in which the design of the currency was changed.

### C. *Fruits of the Initial Search*

The search of Howick's apartment turned up numerous contrived obligations and related documents, including some that had not arrived in the controlled delivery performed by Agent Bedford. Some of the bogus currency contains defects easily discoverable by a skeptical observer, such as the oversized, off-center presidential portraits, noted by Howick, on currency ostensibly lost at least forty years ago. Both the silver and gold certificates were, according to Agent Christine, printed by the ink-jet technology commonly associated with personal computers rather than the intaglio method favored by the United States Treasury.

Particularly unusual among the ostensible currency in Howick's possession were federal reserve notes in the improbable denominations of $100,000,000 and $500,000,000. Printed by silk screen, the notes are completely blank on one side and approximately twice as large as ordinary bills. The first note shows the phrase "ONE HUNDRED MILLION DOLLARS" beneath a portrait of George Washington-the same one seen on one-dollar bills-while the numeral "100" is printed to the right of the portrait over the Treasury Department's seal, and in each of the four corners. The second note looks substantially similar to the face of the now-withdrawn five-hundred dollar bill, with the numeral "500" over the Treasury Department's seal and in each corner, framing a portrait of William McKinley. The only indication of the bill's "true" value is the ornamental phrase beneath the portrait, which reads: "FIVE HUNDRED MILLION DOLLARS." The notes' eye-poppingly large denominations are thousands of times higher than the highest-denomination currency ever actually printed-$100,000 gold certificates-which were in any event never publicly circulated.[4]

Certain defects in the contrived certificates and notes were not obvious to an untrained eye. Some had serial numbers printed in yellow, rather than green, ink. The Treasury seals on certain documents were of poor quality. Some bills marked "Series 1935" listed Francine Neff as Treasurer of the United States, although Ms. Neff did not occupy that position until 1974. The paper on which the bills were printed was sometimes tinted a brownish color, possibly intended to simulate aging.

In addition to the bogus obligations, agents discovered various materials apparently related to the currency-manufacturing enterprise. These included handwritten notes concerning the serial numbers of the putative financial instruments; a letter on "Bank of Richmond" letterhead falsely stating that a $500,000,000 Federal Reserve note had been issued; photographs of dog tags; simulated microfilm relating to the "Tiger Zebra" bonds; a catalogue of U.S. currency; and annotated lists of Secretaries of the Treasury.

### D. *The November Search*

On November 9, 2000, approximately one month after the controlled delivery and initial search, a second search warrant was executed on two computers in Howick's residence. The search, which Howick challenges, *see infra*, yielded few useful materials. The government did, however, seize computer files containing four versions of Howick's resume, each slightly different from the others.

### E. *Procedural History*

In a three-count superseding indictment, Howick was charged with (1) possession

---

4. Printed in 1934–35, before wire transfers were available, these certificates, bearing a portrait of Woodrow Wilson, were used only to transfer wealth within the Federal Reserve system.

with intent to defraud of fictitious documents "appearing, representing, or contriving" to be an actual financial instrument (specifically, a one-hundred million dollar Federal Reserve note and a five-hundred million dollar Federal Reserve note) with intent to pass, utter, or present the same, in violation of 18 U.S.C. § 514(a)(2); (2) possession of counterfeit obligations (specifically, gold and silver certificates), in violation of 18 U.S.C. § 472; and (3) bringing counterfeit obligations (specifically, gold and silver certificates) into the United States, in violation of 18 U.S.C. § 472.

The jury convicted Howick on all three counts. Although the guideline range for Howick's offense level is 97 to 121 months imprisonment, Howick was sentenced to a term of only 24 months, reflecting the district judge's determination that the "[o]ffense level overstates the seriousness of the offense." This appeal followed.

## II.

### A. *Suppression of Evidence*

■ Before trial, Howick moved to suppress the four copies of his resume seized in the November 9 search of his personal computers. The district court denied the motion. Howick now challenges that ruling, arguing (1) that the affidavit in support of the warrant did not set forth particularized facts sufficient to make out probable cause; and (2) that if the affidavit did contain particularized facts, those facts were stale by November 9, 1999, the date the warrant was executed. We find it unnecessary to resolve either question because we conclude that the government has successfully shown beyond a reasonable doubt that the error, if any occurred, was harmless. *See Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (the erroneous admission of evidence does not require

reversal when harmless beyond a reasonable doubt).

True, the government relied on the disputed resumes to cross-examine Howick about his professed "considerable experience in international finance," and later, during closing argument, to shore up its assertion that Howick "was a very educated con man." But Howick himself attested to his experience in such matters, stating during direct examination that he had been recruited for the project because "there are some [financial] instruments ... that I have dealt with over the years that people have called me and asked if I would assist them in doing things with them." He also testified about the proper methods of authenticating and placing financial instruments, suggesting that he had expertise in these areas.

Howick's purposes in offering this testimony are not difficult to discern. After all, the fact that Howick was knowledgeable about financial instruments cuts in both directions: It favors the government insofar as it suggests that Howick ought to have realized that the currency was bogus. But it favors the defense insofar as it suggests that Howick, in light of his known experience, might have been contacted by others involved in a fraudulent scheme in the hope that he would, innocently and in good faith, agree to become involved in the project and, by doing so, lend it an aura of credibility. Having provided information to the jury himself to advance the latter purpose, Howick rendered harmless any error that may have resulted in substantially the same information being provided by the government to advance the former purpose. *See United States v. Haili,* 443 F.2d 1295, 1300 (9th Cir.1971) ("In any event, the error alleged is harmless since [the defendant] admitted [the same information].").

B. *Constructive Amendment of the Indictment*

■ Count I of the superseding indictment charged that "Howick did, with the intent to defraud, possess false or fictitious documents ... with the intent to pass, utter, present, the same." The language of the operative statute is broader: It reaches anyone who with intent to defraud "passes, utters, presents, ... *or attempts or causes the same,* or with like intent possesses" fictitious documents. 18 U.S.C. § 514(a)(2) (emphasis added). As we interpret this provision, "attempts ... the same" means attempts to pass, utter, or present. Similarly, "with like intent possesses" means possesses with intent to pass, utter, or present.

Attempting to pass documents and possessing documents with intent to pass them are, of course, discrete acts and either one can serve as the predicate of a section 514 offense. Thus, while the grand jury could have charged Howick with *attempting* to pass fictitious documents fraudulently, it actually charged him only with *possessing* fictitious documents with the intent to pass them fraudulently.

■ The district court nonetheless instructed the jury that the first element it must find to convict Howick of Count I is that he "possessed, with the intent to pass, utter or present *or to attempt or cause the same,*" fictitious obligations. Howick argues that the variation between the superseding indictment and the jury instruction amounts to a constructive amendment of the indictment, in violation his Fifth Amendment right to due process and his Sixth Amendment right to notice. Howick's challenge focuses only on the presence of the "attempt" phrase in the jury instruction; he does not object to the addition of the term "cause." Our review is de novo. *United States v. Pisello,* 877 F.2d 762, 764 (9th Cir.1989).

■■ In general, "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States,* 361 U.S. 212, 215–16, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *see also United States v. Stewart Clinical Laboratory, Inc.,* 652 F.2d 804, 806 (9th Cir.1981). "[A] constructive amendment occurs when 'the crime charged [is] substantially changed at trial, so that it [is] impossible to know whether the grand jury would have indicted for the crime actually proved.'" *Pisello,* 877 F.2d at 765 (quoting *United States v. Von Stoll,* 726 F.2d 584, 586 (9th Cir.1984)).

There is no doubt that the language in the jury instructions concerning attempt was not present in the superseding indictment. The question is whether the addition unconstitutionally broadened the charges against Howick. We conclude that it did not.

The supplemental language in the jury charge-"possessed, with the intent to pass ... or to attempt ... the same,"-did not accurately track the attempt language of section 514-"passes ... or attempts ... the same, or with like intent possesses." The difference is significant. As it happened, the court did not instruct the jury that it could find Howick guilty for attempting to pass fictitious obligations, an instruction that would have permitted conviction on a theory available under the statute but not included in the indictment. Rather, the message to the jury was that a conviction must be predicated upon a finding that Howick intended to pass the documents, as charged in the superseding indictment, or upon a finding that he intended to attempt to pass them.

The second possibility does not constitute a separate basis for liability, such that adding it to the jury instruction would work an unconstitutional amendment of

the superseding indictment. An "intent to pass" something necessarily includes an "intent to attempt to pass" it. Conversely an "intent to attempt to pass" will amount to an "intent to pass" so long as the attempter does not hope to fail, an unlikely scenario not at issue here. So the jury instructions, while adding unnecessary verbiage, did not make available any theory of liability not charged in Count I of the superseding indictment. Accordingly, we reject Howick's contention that his conviction on Count I must be vacated because the superseding indictment was unconstitutionally amended.

### C. *Sufficiency of the Evidence*

1. *Bringing Counterfeit Currency into the United States.* Count III of the superseding indictment charges Howick with bringing counterfeit currency into the United States, in violation of 18 U.S.C. § 472. In relevant part, the statute provides for a criminal sanction against any person who "brings into the United States or keeps in possession or conceals" counterfeit currency. 18 U.S.C. § 472.

■ At the close of evidence, Howick moved for a judgment of acquittal with regard to Count III pursuant to Federal Rule of Criminal Procedure 29(a). He argued that a conviction on this Count would require a showing by the government that Howick had *personally* transported counterfeit currency across the border, a fact the government concededly had not demonstrated. The government opposed the motion, arguing that a conviction could be predicated on the evidence that Howick had *caused* the relevant documents to be brought into the country by requesting them from Pfahl. The district court elected pursuant to Federal Rule of Criminal Procedure 29(b) to withhold its ruling until after the jury returned its verdict.

During deliberations, the jury inquired into this very issue, asking the court whether a conviction on Count III required a "physical" bringing in of counterfeit currency, or whether causing documents to be brought into the country would suffice. According to the district court, Howick requested that no further instructions be given regarding the offense and the court agreed, telling the members of the jury only that they should "apply their common sense." *United States v. Howick*, 96 F.Supp.2d 1099, 1100 (D.Mont. 2000). The jury returned a verdict of guilty.

■ Afterward, the district court issued an order rejecting Howick's Rule 29 motion, concluding that section 472 does not "require a 'physical' bringing in of the counterfeit ... items." *Id.* Howick now appeals that order. Our review is de novo. *United States v. Pacheco–Medina*, 212 F.3d 1162, 1163 (9th Cir.2000).

■ We agree that the government need not show physical transportation of counterfeit currency into the United States to establish criminal liability. We look first to 18 U.S.C. § 2(b), which provides: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

■■ Admittedly, the superseding indictment did not charge Howick expressly with causing documents to be brought into the country, but, as we have previously explained, this omission does not foreclose a subsequent conviction on a causation theory. "In keeping with the provisions of § 2, it has long been held that an indictment need not specifically charge ... 'causing' the commission of an offense against the United States, in order to support a jury verdict based upon [such] a finding. . . . All indictments must be read in effect, then, as if the alternatives provid-

ed by 18 U.S.C. § 2 were embodied in each count thereof." *United States v. Armstrong,* 909 F.2d 1238, 1241 (9th Cir.1990) (quoting *United States v. Lester,* 363 F.2d 68, 72 (6th Cir.1966)).

Accordingly, we conclude that the district court correctly determined that a section 472 offense may be established by evidence that a defendant caused counterfeit documents to be brought into the country. Since the superseding indictment may be read to have so charged, the prosecution so argued, and the jury so found, we reject Howick's challenge to the sufficiency of the evidence on this ground.

■■■ 2. *The Counterfeit Documents.* Howick also moved for judgment of acquittal on Counts II and III of the indictment-charging him with possessing counterfeit currency and with bringing it into the country, respectively-on the ground that the subject documents were not sufficiently similar to actual currency to support a conviction. Reviewing de novo, *Pacheco–Medina,* 212 F.3d at 1163, we will reject a challenge to the sufficiency of the evidence if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *United States v. Iriarte–Ortega,* 113 F.3d 1022, 1024 n. 2 (9th Cir.1997).

Both Counts II and III of the indictment, based on the counterfeit gold and silver certificates, alleged violations of 18 U.S.C. § 472, which provides:

> Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined under this title or imprisoned not more than fifteen years, or both.

We have previously held that a conviction under section 472 must be predicated on documents that "bear such a likeness or resemblance to genuine currency as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care when dealing with a person supposed to be upright and honest." *United States v. Johnson,* 434 F.2d 827, 829 (9th Cir.1970) (internal quotation marks omitted); *see also United States v. Taftsiou,* 144 F.3d 287, 290 (3d Cir.1998).

According to Howick, the gold and silver certificates did not satisfy this standard because they possessed flaws rendering them "obviously fake," namely: the one-hundred dollar certificates, purporting to be Series 1935, had oversized portraits of Benjamin Franklin, a design that appears only on genuine currency marked Series 1996 or later; the certificates were printed on paper that lacked the "very small nylon fibers embedded throughout" that are found in actual currency; the certificates were not printed by the intaglio method used by the Bureau of Engraving and Printing on behalf of the United States Treasury; and the serial numbers were printed on the certificates, whereas the serial numbers on actual currency are, in effect, stamped into the paper.

■■■ Howick's challenge falls well short of establishing insufficiency of the evidence with regard to Counts II and III. The certificates' defects may have been apparent to a skeptical examiner trained in the detection of counterfeit currency, but they could easily have been overlooked by an ordinary person who had no grounds for suspicion. It is not common practice to verify that the money in one's pocket bears a design in accordance with its Series date, or to run one's fingers across the bills' corners to find the hallmarks of the intaglio printing method. Bogus currency that can be detected by such means may there-

fore still be "calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care when dealing with a person supposed to be upright and honest." *Johnson,* 434 F.2d at 829.

Accordingly, we conclude that a rational trier of fact could have found the essential elements of the offenses charged in Counts II and III of the indictment, and therefore affirm Howick's convictions on those Counts.

■ 3. *The Fictitious Documents.* More difficult to resolve is Howick's challenge to the sufficiency of the evidence supporting Count I of the superseding indictment. The substance of the challenge is the same-that the relevant documents are clearly fake and therefore cannot support a conviction-but both the factual and legal circumstances are different in the following respects: Howick's factual claim that the documents are obviously false is considerably stronger, but the legal question whether, and if so to what degree, the relevant documents must appear genuine to be unlawful is as yet unsettled.

Count I of the superseding indictment, based on the $100,000,000 and $500,000,000 federal reserve notes, charged Howick with possession of *fictitious* obligations, in violation of 18 U.S.C. § 514, as opposed to *counterfeit* obligations covered by section 472, as were at issue in Counts II and III. The fictitious obligation statute provides:

Whoever, with the intent to defraud ... passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States; ... any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other

financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.

18 U.S.C. § 514(a)(2).

Section 514 is a rather new statute; under it, prosecution appears to be infrequent. It differs from the preexisting counterfeit statute, section 472, which reaches "falsely made, forged, [and] counterfeit" obligations, in that section 514, reaches "false or fictitious" obligations, so long as they appear to be "actual." Plainly, section 514 was intended to criminalize a range of behavior not reached by section 472.

We find the legislative history of section 514 helpful in illuminating more precisely the differences between that provision and section 472. The need to criminalize possession of fictitious, as opposed to counterfeit, documents was explained in 1995 by then-Senator Alfonse D'Amato, who introduced the legislation:

Mr. President, I am today introducing the Financial Instruments Anti–Fraud Act of 1995.

This legislation combats the use of factitious[5] financial instruments to defraud individual investors, banks, pension funds, and charities. These fictitious instruments have been called many names, including prime bank notes, prime bank derivatives, prime bank guarantees, Japanese yen bonds, Indonesian promissory notes, U.S. Treasury warrants, and U.S. dollar notes....

. . . . .

*Because these fictitious instruments are not counterfeits of any existing ne-*

---

**5.** The term "factitious" means produced by artifice. We are not aware whether "fictitious" or "factitious" was intended here, but we leave the printed version of Senator D'Amato's remarks unaltered.

gotiable instrument, Federal prosecutors have determined that the manufacture, possession, or utterance of these instruments does not violate the counterfeit or bank fraud provisions contained in chapters 25 and 65 of title 18 of the United States Code. The perpetrators of these frauds can be prosecuted under existing Federal law only if they used the mails or wires, or violated the bank fraud statute.

Mr. President, we have worked closely with the Treasury Department and various U.S. Attorneys' Offices to prepare the Financial Instruments Anti–Fraud Act of 1995. This bill makes it a violation of Federal law to possess, pass, utter, publish, or sell, with intent to defraud, any items purporting to be negotiable instruments of the U.S. Government, a foreign government, a State entity, or a private entity. *It closes a loophole in Federal counterfeiting law.* 141 Cong. Rec. S9533–34 (emphasis added).

 The distinction that emerges is this: A "counterfeit" obligation is a bogus document contrived to appear similar to an existing financial instrument; a "fictitious" obligation is a bogus document contrived to appear to be a financial instrument, where there is in fact no such genuine instrument, and where the fact of the genuine instrument's nonexistence is presumably unknown by, and not revealed to, the intended recipient of the document.

 In keeping with this distinction, we interpret the phrase "false or fictitious instrument" in section 514 to refer to nonexistent instruments, whereas the phrase "falsely made, forged, counterfeited, or altered obligation" in section 472 refers to doctored up versions of obligations that truly exist. So, for example, a phony hundred-dollar bill might be unlawful pursuant to section 472, the counterfeit statute, while a document purporting to be

a negotiable "Federal Treasury Warrant," of which there are no genuine versions, might fall under the fictitious obligation statute, section 514.

The question we face-one of first impression-is whether section 514 contains a threshold requirement with respect to the credibility of the contrived documents and, if so, whether the $100,000,000 and $500,000,000 bills were sufficiently credible to support a conviction.

Howick urges us to read a "similitude" requirement into section 514, akin to the requirement in section 472 that the offending documents must "bear such a likeness or resemblance to genuine currency as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation...." *Johnson,* 434 F.2d at 829; *see supra.* We find the notion of similitude ill-suited to the fictitious obligation statute. As stated, section 514 applies to documents that are *not* forgeries of any existing financial instrument. What, then, would a fictitious obligation have to be similar to?

More appropriate under these circumstances is the idea of verisimilitude-the quality of appearing to be true or real. Section 514 reaches documents "appearing, representing, purporting, or contriving ... to be an *actual* security or other financial instrument." 18 U.S.C. § 514(a)(2) (emphasis added). The significance of the term "actual" in this context requires some explanation, since the very purpose of the statute is to supplement the preexisting counterfeit laws by criminalizing bogus obligations that are not copies of any *actual* obligation. What is perhaps the most natural interpretation of "actual ... financial instrument"-an instrument that really exists-is therefore unavailable. Put differently, because, for example, "actual Federal Treasury Warrants" is a null set, it cannot be that to violate section 514 a

purportedly negotiable "Federal Treasury Warrant" must appear to be an actual one.

■■■■■ To give meaning to the phrase "actual security or other financial instrument," then, we must read the statutory language more generally. An unlawful fictitious obligation, we conclude, is one that appears to be "actual" in the sense that it bears a family resemblance to genuine financial instruments. The offending document must, in other words, include enough of the various hallmarks and indicia of financial obligations so as to appear to be within that class. The test, then, is not whether the document is similar to any financial obligation in particular, but whether taken as a whole it is apparently a member of the family of "actual . . . financial instrument[s]" in general.[6]

■■■■■ This is by necessity an ad hoc analysis, for the range of possible financial obligations is limitless and so too, for that reason, is the range of fictitious ones. No particular mark or characteristic is independently determinative such that its presence or absence alone could resolve the question whether a document purports to be a negotiable instrument. The question is whether the document's features are among the various and sundry ones commonly found in genuine obligations, and, relatedly, whether it is free of disqualifying marks. We do not attempt to set forth an exhaustive list of the relevant attributes, but they include such things as official seals; serial numbers; portraits of government buildings, officials, or statespersons; symbols or mottos of the issuing nation or entity; official signatures; dates of issue; and statements to the effect that the document shall serve as legal tender or shall be redeemable for something of value.

■■■ The standard we announce today is not a stringent one. We are mindful of the fact that section 514 was enacted to reach documents not striving to duplicate any existing obligation. Individuals who accept such documents as negotiable instruments will have ignored or deemed unimportant a significant ground for suspicion: that the putative obligation is largely or entirely unfamiliar. Having blundered ahead that far, they will be without clear guidelines to discern authentic obligations from false ones because they will have no precise model of what the bona fide articles look like.

■■■■■ Thus, those who regard fictitious obligations as genuine will likely include persons of a rather credulous nature, and moreover persons who lack a key protection available to the intended recipients of counterfeit currency: the ability to detect bogus obligations by noticing variations between the phony document and the real McCoy. Accordingly, by enacting section 514, Congress provided protection from fraud to a particularly vulnerable class of victims. In keeping with that objective, we conclude that the statute criminalizes even bogus obligations that a prudent person might upon consideration be unlikely to accept as genuine, so long as those documents bear a family resemblance to actual financial obligations. To trigger liability, in other words, the document need only credibly hold itself out as a negotiable instrument.

Thus, for example, a putative financial obligation bearing a large portrait of a dog smoking a cigarette would probably not

---

**6.** Having thus interpreted the statute, we reject Howick's contention that if section 514 does not contain a similitude requirement, it is void for vagueness. The statutory language is not so vague, nor is our construction of it so unexpected, as to deprive defendants of fair warning of the conduct made criminal. *Rogers v. Tennessee*, 532 U.S. 451, ——, 121 S.Ct. 1693, 1698, 149 L.Ed.2d 697 (2001).

appear to be an actual financial instrument, and therefore would probably not support a section 514 conviction. But an ostensible "United States Bank Certificate" with a portrait of President Monroe might, even if a prudent person would look at the document and say, in effect: "It appears to be some sort of money, but I've never seen anything like it, I don't believe that it's United States currency, and I won't take it in lieu of ordinary money."

In so departing from the reasonable victim standard applicable to section 472, *see Johnson*, 434 F.2d at 829, we reject the suggestion that a parade of horribles will follow in which defendants are convicted of violating section 514 for possession of "Monopoly money" and other mock currency. Two factors support this conclusion: First, section 514 convictions must be based on documents that appear objectively to be "actual" obligations, and mock currency will fail that test. Second, section 514 contains the subjective element of "intent to defraud," and as a practical matter, documents that are obviously not negotiable instruments will rarely be employed in a fraudulent scheme to persuade others that they are negotiable. Thus, the implausibility of mock currency may count as circumstantial evidence that the requisite intent to defraud was not present.

Applying this standard to the facts at hand, we conclude that a rational trier of fact could have found the essential elements of a section 514 violation, and therefore affirm Howick's conviction on Count I of the superseding indictment. The offending documents contained many of the indicia of genuine financial instruments, including presidential portraits used on genuine currency; official seals; ornamental phrases; official signatures; series dates; and statements that the notes are "legal tender for all debts public and private," and in the case of the $500,000,000 bill, that it is "redeemable in lawful money at the United States Treasury or at any Federal Reserve Bank." The bills were also free of disqualifying marks, such as, for example, a statement that the document is not negotiable. Indeed, during trial Howick's defenses included the claim that he himself believed that the notes may have been authentic, a position in obvious conflict with his present claim that the notes are so implausible that they do not appear to be actual obligations.

The evidence also showed that Howick made reference to the $100,000,000 and $500,000,000 notes in one fax and one email to private parties not directly involved in the project, apparently sent to advance the goal of eventually placing the bogus documents. The jury was properly instructed that to convict Howick of possessing the notes, it had to find that he intended to defraud others with them. Apparently, it did so find.

In these circumstances, and in light of our construction of the statute set forth above, we cannot say that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

AFFIRMED.