**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

ALBERT R. SALMAN,
            *Defendant-Appellant.*

No. 05-10093

D.C. No.
CR-03-00197-LRH

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
June 9, 2008—San Francisco, California

Filed July 7, 2008

Before: A. Wallace Tashima, M. Margaret McKeown, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

8119

## COUNSEL

Franny Forsman, Federal Public Defender, and Michael K. Powell, Assistant Federal Public Defender, Reno, Nevada, for the defendant-appellant.

Gregory A. Brower, United States Attorney, Robert L. Ellman, Appellate Chief, and Elizabeth A. Olson, Assistant United States Attorney, Reno, Nevada, for the plaintiff-appellee.

## OPINION

GOULD, Circuit Judge:

Albert R. Salman appeals his convictions for two counts of passing a fictitious financial instrument, in violation of 18 U.S.C. § 514(a)(2), and two counts of attempting corruptly to interfere with the administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a). On two separate occasions, Salman sent a document he titled "Sight Draft" and a tax payment voucher for the amount of the sight draft to the Internal Revenue Service ("IRS"). Relying on our decision in *United States v. Howick*, 263 F.3d 1056 (9th Cir. 2001), Salman argues that the sight drafts he submitted to the IRS are not unlawful fictitious financial instruments under 18 U.S.C. § 514(a)(2), and therefore the government presented insufficient evidence to support his convictions on those counts. Salman also challenges the sufficiency of the evidence to support his convictions for corruptly interfering with the administration of the internal revenue laws, arguing that because his convictions under 26 U.S.C. § 7212(a) are directly dependent on his passing of unlawful fictitious instruments, they can only stand if his convictions under 18 U.S.C § 514(a)(2) stand. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm Salman's convictions, concluding that the documents he presented to the IRS are unlawful fictitious financial instruments under 18 U.S.C. § 514(a)(2).

## I

On November 5, 1998, the IRS received from Salman a

1998 Payment Voucher 3, Form 1040-ES, a form used to make a payment of estimated taxes for the 1998 tax year, which indicated that Salman was paying $750,000 in estimated taxes. Along with the voucher, the IRS received a document labeled "SIGHT DRAFT" which included many characteristics common to a check.[1]

On January 25, 1999, the IRS received from Salman a 1998 Payment Voucher 4, Form 1040-ES, a form also used to make a payment of estimated taxes for the 1998 tax year, which indicated that Salman was paying $250,000 in estimated taxes. Along with the voucher, the IRS received a document nearly identical to the one Salman sent in December 1998, but for the amount of $250,000.[2]

On October 22, 2003, Salman was indicted on two counts of passing a fictitious instrument, in violation of 18 U.S.C. § 514(a)(2). On April 7, 2004, a federal grand jury returned a four-count superseding indictment, adding to the two counts in the previous indictment two counts of attempting to interfere with the administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a).

On September 14, 2004, Salman's jury trial commenced. At the trial, Kristy Morgan, an IRS employee, testified to Salman's past history of tax violations, stating that Salman owed more than $4500 in taxes and $2000 in penalties. Ted Reusser, a bank examiner from the Office of the Comptroller of the Currency of the Department of the Treasury, testified that "the Treasury doesn't use sight drafts as a method of payment so there is no such instrument as a sight draft issued by the Treasury." The government asked Reusser to compare the sight drafts to a common check. Reusser testified that the words "NON-NEGOTIABLE" on the sight drafts meant that "you can't use it like a common check, you can't take it to

---

[1]*See infra* app. A.

[2]*See infra* app. B.

your bank, you can't endorse it, you can't move [it] around, it should be negotiated between the parties on the document." Reusser also testified that even though the sight drafts had features common to checks, they also lacked things associated with checks, like a bank in the address line, a magnetic ink routing number, special paper, and watermarks. He also noted that none of these features were required for a check to be valid.

At the close of the government's case, Salman made a Federal Rules of Criminal Procedure Rule 29 motion, arguing that there was insufficient evidence of a fictitious obligation—the government had not shown Salman's intent to defraud or his intent corruptly to impede or to interfere with the enforcement of the internal revenue laws. The district court denied the motion.

Salman then called his friend, Pat Devore, who testified that he and Salman designed the sight drafts "specifically so they could not be considered as any one specific type of instrument." Devore testified that Salman and he had spent "literally hundreds of hours" researching various aspects of the work of Roger Elvick, including how to create a fictitious sight draft. Devore testified that as Salman and Devore created the sight drafts, Devore questioned Elvick, in writing and by phone, about the procedures he recommended. In a letter to Elvick, Devore explained that he and Salman wanted to ensure that if Salman was ever "dragged into court," he would be "laughing all the way to the bank."

On September 16, 2004, the jury found Salman guilty of all four counts. On January 21, 2005, the district court entered judgment, sentencing Salman to 12 months of imprisonment on each count, to be served concurrently, and five years of supervised release. Salman timely filed a notice of appeal challenging the sufficiency of the evidence to support his convictions.

## II

We review de novo the sufficiency of the evidence to support a conviction. *United States v. Esquivel-Ortega*, 484 F.3d 1221, 1224 (9th Cir. 2007). "There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Moreland*, 509 F.3d 1201, 1216 (9th Cir. 2007) (internal quotation marks and citation omitted).

## III

Counts I and II of the superseding indictment, based on the $750,000 and $250,000 sight drafts, charged Salman with presenting fictitious instruments to the IRS in violation of 18 U.S.C. § 514(a)(2) ("§ 514"). The fictitious instrument statute provides:

> Whoever, with the intent to defraud . . . passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States . . . any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.

18 U.S.C. § 514(a)(2).

[1] In *Howick*, we interpreted § 514, determining that it "was intended to criminalize a range of behavior not reached" by the counterfeit statute, 18 U.S.C. § 472. 263 F.3d at 1066. We delineated the distinction as follows:

> A "counterfeit" obligation is a bogus document contrived to appear similar to an existing financial instrument; a "fictitious" obligation is a bogus document contrived to appear to be a financial instrument, where there is in fact no such genuine instrument, and where the fact of the genuine instrument's nonexistence is presumably unknown by, and not revealed to, the intended recipient of the document.

*Id.* at 1067. Applying this distinction, we interpreted "fictitious instruments" to mean "nonexistent instruments," and concluded that § 514 requires verisimilitude, which demands that the documents have the quality of appearing to be true or real. *Id.* To meet its burden of proof under § 514, the government must show that the:

> unlawful fictitious obligation . . . appears to be "actual" in the sense that it bears a family resemblance to genuine financial instruments. The offending document must, in other words, include enough of the various hallmarks and indicia of financial obligations so as to appear to be within that class. *The test, then, is not whether the document is similar to any financial obligation in particular, but whether taken as a whole it is apparently a member of the family of "actual . . . financial instrument[s]" in general.*

*Id.* at 1068 (alterations in original) (emphasis added).

Salman contends that *Howick* precludes his convictions for passing fictitious financial instruments in violation of § 514. He offers three principal arguments to support this contention. First, Salman argues that the IRS is not among the class of victims that Congress intended to protect by enacting § 514. Second, Salman contends that *Howick* requires that the fictitious instruments be negotiable to satisfy the intent to defraud element of § 514, and that his sight drafts are clearly marked

"NON-NEGOTIABLE." Finally, Salman argues that the documents he sent to the IRS do not bear sufficient indicia or hallmarks of financial obligations, and therefore are not unlawful fictitious instruments under § 514. We reject Salman's arguments, and uphold his convictions. We distinguish *Howick* based on the type of financial obligations under examination in that case, and hold that a rational jury could have found beyond a reasonable doubt that the sight drafts Salman submitted to the IRS were unlawful fictitious instruments under § 514.

## A

**[2]** Salman first challenges his convictions under § 514 by arguing that the IRS is not among the class of victims Congress intended to protect by the fictitious instrument statute. In support of this argument, Salman points to language in *Howick* that states, "[B]y enacting section 514, Congress provided protection from fraud to a particularly vulnerable class of victims." 263 F.3d at 1068. This argument fails for two reasons. First, the plain language of the statute does not limit its application to a particular class of victims. *See* 18 U.S.C. § 514; *see also* 142 Cong. Rec. S10155, S10183 (Sept. 10, 1996) (statement of Sen. D'Amato) (explaining the need for the legislation, D'Amato detailed the story of a woman who had fraudulently passed comptroller warrants to the IRS, and had evaded prosecution because of the loopholes in the counterfeit statute). Second, Salman takes the language in our *Howick* opinion out of context. In *Howick*, we emphasized the particularly vulnerable class of victims to explain why we were implementing a low threshold for what constituted a credibly fictitious financial instrument, not to identify a limited class of protected victims. 263 F.3d at 1068 (Because "those who regard fictitious obligations as genuine will likely include persons of a rather credulous nature . . . the statute criminalizes even bogus obligations that a prudent person might upon consideration be unlikely to accept as genuine, so long as those documents bear a family resemblance to actual

financial obligations."). The plain language of the statute and our holding in *Howick* do not limit violations of § 514 to acts committed against a particular class of victims.

**B**

Next, Salman argues that because he marked his sight drafts "NON-NEGOTIABLE," they are disqualified from "appearing, representing, purporting, or contriving . . . to be an actual security or other financial instrument issued under the authority of the United States," 18 U.S.C. § 514(a). Salman contends that our *Howick* decision interpreted § 514 to require that any false instrument be negotiable in order to qualify as an unlawful fictitious obligation. We hold, however, that in *Howick* we focused on the negotiable nature of the documents at issue solely because the false documents there were negotiable Federal Reserve notes. Here, where the documents at issue are nonnegotiable sight drafts, the "NON-NEGOTIABLE" mark does not place them beyond the reach of § 514.

[3] The plain language of the statute does not require that fictitious financial instruments be negotiable to be unlawful. *See* 18 U.S.C. § 514(a)(2). The statute requires only that a fictitious document appears, represents, purports or contrives through scheme or artifice, "to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization." *Id.* In support of his contention that the passing of nonnegotiable fictitious instruments is not unlawful under § 514, Salman points to then-Senator D'Amato's comments, published in the Congressional Record, that the Financial Instruments Anti-Fraud Act of 1995 makes it a violation of law to pass with the intent to defraud "any items purporting to be negotiable instruments." *See* 141 Cong. Rec. S9533-34 (June 19, 1995). Because then-Senator D'Amato's comments were made as an introduction to his proposed bill, and not as an explanation of

why § 514 excludes nonnegotiable instruments from its definition of fictitious obligations, they do not offer support for limiting the scope of § 514 to include only negotiable instruments. Moreover, the purpose identified by then-Senator D'Amato for the legislation—to "close[ ] a loophole in Federal counterfeiting law"—supports the broadest possible reading of "actual security or other financial instrument," one that would include both negotiable and nonnegotiable instruments. *Id.* Under the plain language of the statute, Salman's documents qualify as unlawful fictitious instruments under § 514 because they appear to be financial obligations—sight drafts —issued under the authority of the United States. Because these phony sight drafts on their face pose a capacity to deceive, they come within the literal language and common intendment of § 514's prohibition.

Despite the plain language of the statute, Salman argues that *Howick* prohibits nonnegotiable instruments from qualifying as unlawful fictitious documents under § 514. In *Howick*, we analyzed whether fraudulent Federal Reserve notes were sufficiently credible to constitute fictitious obligations under § 514. 263 F.3d at 1067. We defined the standard for credibility to be "whether [when] taken as a whole [the document] is apparently a member of the family of 'actual . . . financial instrument[s]' in general," and acknowledged that determining whether a document is sufficiently credible is "by necessity an ad hoc analysis, for the range of possible financial obligations is limitless and so too, for that reason, is the range of fictitious ones." *Id.* at 1068. We then made several references to the requirement that an instrument be negotiable to be deemed credible under this standard. *See id.* ("No particular mark or characteristic is independently determinative such that its presence or absence alone could resolve the question whether a document purports to be a negotiable instrument.") ("To trigger liability, in other words, the document need only credibly hold itself out as a negotiable instrument."); *Id.* at 1069 ("The bills were also free of disqualifying marks, such as, for example, a statement that the document is

not negotiable."). Salman argues that this requirement that a fictitious instrument be negotiable extends beyond the facts of *Howick*, which involved negotiable Federal Reserve notes, to all cases under § 514, and precludes the prosecution of individuals who pass fictitious nonnegotiable instruments, no matter how closely the fictitious instruments resemble genuine financial instruments. We decline to adopt Salman's reading of *Howick* because it would unnecessarily limit the scope of § 514, contrary to what Congress said in its statutory language, and would reopen a loophole in the counterfeit statute that Congress purposely closed when it enacted § 514.

Instead, *Howick*'s discussion of a negotiable requirement reflects the type of fictitious instruments that were squarely at issue in that case. *Howick* involved Federal Reserve notes of $100,000,000 and $500,000,000. 263 F.3d at 1067. A Federal Reserve note is a negotiable instrument—it can "pass from hand to hand, either by delivery or indorsement, giving to each successive recipient a right against the debtor." THOMAS E. HOLLAND, THE ELEMENTS OF JURISPRUDENCE 315-16 (13th ed. 1924). In order for the Federal Reserve notes in *Howick* to have been sufficiently credible to constitute unlawful fictitious instruments under § 514, they must have been negotiable financial instruments. As such, the class of financial instruments that the fictitious Federal Reserves notes in *Howick* had to resemble were negotiable instruments. To the contrary, the fictitious financial instruments passed by Salman were sight drafts. Ted Reusser, a bank examiner with the Office of the Comptroller of the Currency of the Department of the Treasury, testified at Salman's trial that sight drafts are commonly nonnegotiable and that labeling a sight draft nonnegotiable does not render it invalid, but merely places "some limitations on how [it] can be passed around if people play by the rules."[3]

---

[3]Nonnegotiable instruments are incapable of being transferred by indorsement or delivery. BLACK'S LAW DICTIONARY 1082 (8th ed. 2004). According to Reusser, "[a] draft is simply an order to pay, and by putting the word sight in front of it just implies that you're to pay that item on

Therefore, a sight draft, unlike a Federal Reserve note, is not necessarily a member of the negotiable class of financial instruments, and a fictitious sight draft cannot be disqualified from being an unlawful fictitious obligation under § 514 merely on the basis that it is a nonnegotiable instrument. Our decision in *Howick* does not preclude prosecution of individuals, like Salman, who pass fictitious nonnegotiable instruments. The evil that Congress assessed and the scope of its remedy cover fictitious, deceptive financial instruments, whether or not they are in a class that is negotiable. For a fictitious negotiable instrument to have verisimilitude, it must appear to be negotiable. However, it stands to reason that for a fictitious nonnegotiable financial instrument, verisimilitude will not require an appearance of negotiability.

**[4]** We hold that the plain language of 18 U.S.C. § 514(a)(2) prohibits the passing of any false or fictitious instrument—whether negotiable or nonnegotiable —that appears, represents, purports, or contrives through scheme or artifice, to be an actual security or other financial instrument. Where, as is the case here, the fictitious instrument is representing an actual instrument that is nonnegotiable, the label "NON-NEGOTIABLE" on the fictitious instrument is not a disqualifying mark.

## C

Finally, Salman argues that the fraudulent sight drafts he passed do not bear sufficient indicia or hallmarks of actual financial obligations to be prohibited under § 514. In *Howick*, we provided a nonexhaustive list of relevant attributes that indicate the credibility of a fraudulent instrument:

---

sight." Reusser also testified that sight drafts are usually nonnegotiable instruments: "They're prearranged situations where two parties—two or more parties have agreed to make payment between themselves, and it could have conditions attached to it, or it could have other items which would not meet the terms of negotiability."

official seals; serial numbers; portraits of government buildings, officials, or statespersons; symbols or mottos of the issuing nation or entity; official signatures; dates of issue; and statements to the effect that the document shall serve as legal tender or shall be redeemable for something of value.

263 F.3d at 1068. Salman argues that none of these attributes are found on his sight drafts, and that therefore his sight drafts do not sufficiently resemble genuine financial documents to be unlawful under § 514.

   **[5]** The *nonexhaustive* list provided in *Howick*, however, focused on attributes found on negotiable instruments, and Federal Reserve notes in particular, leaving out attributes typically found on other financial obligations, like checks. Salman's sight drafts did not include official seals, mottos, or watermarks, things typically found on, for example, checks issued by the United States Treasury to individuals receiving tax refunds. However, Reusser testified at Salman's trial that none of those features are requirements of a valid check. Moreover, as an examination of Appendices A and B will disclose, Salman's sight drafts did include (1) a pre-printed, 3-line block of text that listed the "United States Treasury" and an address; (2) a pre-printed, red-ink check number; (3) an "Authorized Signature"; (3) pre-printed lines for a "Certified Draft No.," a "UCC Registration No.," and a "Voucher No."; and (4) the phrase "TENDER-AT PAR (HJR-192)." Because § 514 "criminalizes even bogus obligations that a prudent person might upon consideration be unlikely to accept as genuine," *Howick*, 263 F.3d at 1068, a rational jury could have found beyond a reasonable doubt that Salman's sight drafts sufficiently resembled an actual financial obligation such that they were unlawful under § 514.

   **[6]** Salman argues that the government failed to present sufficient evidence to convict him of violating § 514 because the government's expert, Reusser, only testified regarding the

hallmarks of checks, and did not testify as to the indicia of sight drafts. Salman misunderstands the verisimilitude standard we articulated in *Howick*. A fictitious instrument need not resemble a specific actual instrument. Instead, the test is "whether taken as a whole it is apparently a member of the family of 'actual . . . financial instrument[s].' " 263 F.3d at 1068. The government was not required to present expert testimony regarding sight drafts to prove that Salman's fictitious instruments resembled the family of actual financial instruments.

Moreover, the context in which the fictitious sight drafts were presented is not wholly irrelevant. These were tendered to the IRS with tax payment vouchers, contributing to the impression that these financial instruments were making a payment, and heightening their capacity to deceive.

**[7]** We hold that Salman's sight drafts bear sufficient indicia or hallmarks of actual financial obligations to be prohibited under § 514.

**IV**

In conclusion, we hold that Salman's sight drafts qualify as unlawful fictitious financial instruments under 18 U.S.C. § 514(a)(2). We also reject Salman's second argument on appeal—that the government presented insufficient evidence to support his convictions under 26 U.S.C. § 7212(a)—because it relies entirely on Salman's unsuccessful first argument.

**AFFIRMED.**

## APPENDIX A

## APPENDIX B

Social Security Numbers redacted from documents.