[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13042
_____

D.C. Docket No. 3:10-cr-00199-TJC-MCR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DENNIS GRAY WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 22, 2015)

Before MARTIN and ROSENBAUM, Circuit Judges, and COOGLER,[*] District Judge.

COOGLER, District Judge:

## I.    Introduction

Dennis Gray Williams ("Williams") appeals his convictions under a seven-count indictment for the passing of "false or fictitious" instruments (Counts 1–5), in violation of 18 U.S.C. § 514(a); the use of an unauthorized "access device" (Count 6), in violation of 18 U.S.C. § 1029(a)(5) and (c)(1)(B); and failure to appear (Count 7), in violation of 18 U.S.C. § 3146(a)(1) and (b)(1)(A)(ii). Williams argues that the fraudulent checks that served as the basis for his conviction were not "false or fictitious instruments" as the phrase is used in § 514. Williams further argues that evidence of his use of the bank account and routing numbers found on ordinary paper checks to effect online transactions does not support his conviction in Count Six for the unauthorized use of an "access device" under § 1029. Finally, Williams argues that a violation of the terms of supervised release is not a sufficient predicate offense to support his conviction for failure to appear under § 3146.

After careful review of the record and the briefs of the parties, and having the benefit of oral argument, we affirm Williams's convictions.

_____

* Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

2

## II.    Background

### A. Counts 1–5: Passing of a "False or Fictitious Instrument" Under 18 U.S.C. § 514

From January 2010 to April 2010, Williams passed or facilitated in passing illegal checks on at least five occasions. Four of the checks bore the account and routing numbers for an account at CNL Bank belonging to Mark and Laurie Gelman. The fifth check appeared to be a cashier's check issued from SunTrust Bank purporting to be on behalf of Jim and Kathleen Smith. However, the check actually contained an account and routing number for a bank account owned by the Florida Healthy Kids Corporation. Williams crafted all of the checks at issue from whole cloth using blank check stock and check-writing software.

In January 2010, Williams passed the first of these fake checks. The check was in the amount of $844.35 and was made payable to Kendra Lowery. The check purported to be drawn from a CNL Bank account owned by D.G. Williams Company, Inc. However, the check actually bore the routing and account numbers for the Gelmans' CNL Bank account, and thus resulted in the withdrawal of funds from that account. Also in January 2010, Williams passed a fake check to Darrel Thomas ("Thomas") as payment for labor Thomas performed. The check was for $486.30 and purported to draw payment from a CNL Bank account owned by Lake County Collision, Inc. Again, the check actually bore the account and routing numbers for the Gelmans' account.

3

Williams passed fake checks in a similar manner on two other occasions, one in March 2010 and the other in April 2010, to pay a utility bill ($430) and to purchase pre-paid cell phone minutes ($300), respectively. The first of these checks actually purported to draw from the Gelmans' account and bore the falsified signature of Laurie Gelman, while the second of these checks claimed to be from an account belonging to Lannetta C. Spivey. Also in March 2010, Williams used a fake check to purchase jewelry from Brandi Goetzman ("Goetzman"). Goetzman sold jewelry through Craigslist.com. When inquiring about purchasing jewelry from Goetzman, Williams represented to her that his name was Jim Smith. Goetzman required payment by certified funds, prompting Williams to give her what appeared to be a cashier's check for $4,500.00. The cashier's check purported to be drawn from the SunTrust Bank account of Jim and Kathleen Smith. However, the check actually displayed the account and routing numbers for a SunTrust Bank account belonging to the Florida Healthy Kids Corporation.

## B. Count Six: Use of an Unauthorized Access Device Under 18 U.S.C. § 1029

Starting in late 2009, Williams used the account and routing numbers associated with the Gelmans' CNL Bank account to make online payments for various goods and services, including payments on a Wal-Mart credit card, payments to a cell phone service provider, and payments to a rental storage

4

company. These transactions resulted in Williams obtaining things of value in excess of $6,700.00 from December 2009 through April 2010. Unlike the transactions forming the basis for the charges in Counts 1–5, no paper instrument was issued, exchanged, or created. Rather, Williams made "electronic check" payments via the companies' websites by inputting the account and routing number belonging to the Gelmans' CNL account. The transactions were then charged against the Gelmans' account without their consent.

## C. Count Seven: Failure to Appear Under 18 U.S.C. § 3146

Throughout the time Williams engaged in the above-discussed conduct, he was on supervised release due to previous federal convictions. In 2003, Williams was convicted of uttering a counterfeit check, and in 2004 he was convicted of committing credit card fraud. In April 2010, Williams was arrested for violating the terms of his supervised release. He was later released on his own recognizance, and a hearing was set for May 27, 2010. Notice of the hearing was mailed to both Williams and his counsel. Williams failed to appear at the hearing, resulting in the charge asserted in Count Seven.

## D. Procedural History

On September 15, 2010, a federal grand jury in the Middle District of Florida returned a seven-count superseding indictment charging Williams with intentionally passing false or fictitious instruments, in violation of 18 U.S.C. § 514

5

(Counts 1–5)[1]; fraudulently obtaining money or property through unauthorized use of an access device, in violation of 18 U.S.C. § 1029 (Count 6); and failing to appear at his supervised release revocation hearing, in violation of 18 U.S.C. § 3146 (Count 7). The trial of this matter was somewhat unusual in that, with the consent of the government, Williams elected to waive his right to a trial by jury, and thus was tried under a non-jury format as provided in Fed. R. Crim. P. 23(a) and (c). Following conclusion of the government's case-in-chief, Williams moved for a judgment of acquittal under Fed. R. Crim. P. 29(b), arguing that the evidence offered at trial was insufficient to convict him under the charged statutes. The district court reserved ruling on the motion until the parties had an opportunity to submit arguments. On September 21, 2011, the district court issued an order and memorandum of opinion denying Williams's Rule 29 motion. The district court publicly announced the verdict in June 2012. Williams filed a motion seeking a new trial pursuant to Fed. R. Crim. P. 33. The district court denied Williams's Rule 33 motion on September 24, 2012, and sentenced Williams to 228 months' imprisonment for Counts 1–6. These terms were to run concurrently with one another. The district court sentenced Williams to twelve months' imprisonment on

---

[1] Specifically, Count One was based on the check given to Lowery; Count Two, the check passed to Thomas; Count Three, the apparent "cashier's check" passed to Goetzman; Count Four, the check given to Spivey and used to pay a power bill; and Count Five, the check given to Spivey and used to purchase prepaid minutes for a cell phone.

6

Count Seven, to run consecutively to the sentence for Counts 1–6. Williams filed a timely notice of appeal.

### III.    Discussion

Williams argues that, as a matter of law, his conduct does not support a conviction as to any count in the superseding indictment. Williams frames his argument as one challenging the sufficiency of the evidence supporting his convictions. However, this appeal turns on matters of statutory interpretation, as he argues that, under the "correct" interpretation of the relevant criminal statutes, the government failed to offer sufficient evidence to convict him.  We review *de novo* a district court's interpretation of criminal statutes. *See United States v. Rojas*, 718 F.3d 1317, 1319 (11th Cir. 2013). To the extent that Williams's appeal actually requires an evaluation of the weight that the district court gave to the evidence, we review *de novo* the sufficiency of evidence to support a conviction, and view the evidence "in the light most favorable to the government." *See United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007).

### A. *Passing of a "False or Fictitious Instrument" Under 18 U.S.C. § 514*

First, Williams argues that the district court erred in finding that his conduct was sufficient to support a conviction under 18 U.S.C. § 514. Specifically, Williams contends that the fraudulent checks at issue, while admittedly

counterfeited, were not "false or fictitious" instruments within the meaning of

§ 514.[2] Section 514 criminalizes the conduct of a defendant who:

> with the intent to defraud . . . draws, prints, processes, produces, publishes, or otherwise makes . . . [or] passes, utters, presents, [or] offers . . . any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States . . . or an organization . . . .

18 U.S.C. § 514(a). The terms found in § 514(a) are defined by reference to 18

U.S.C. § 513. *See* 18 U.S.C. § 514(b) (stating that "any term used in this section

that is defined in section 513(c) has the same meaning"). While § 513 defines

"security" to include a check and defines "organization" to include corporations

operating in interstate commerce, the statute is silent as to what constitutes a "false

or fictitious instrument, document, or other item." *See* 18 U.S.C. § 513(c).

In the absence of a statutory definition, this Court must first consider

whether the language at issue has a plain and unambiguous meaning. *See United*

*States v. Fisher*, 289 F.3d 1329, 1337–38 (11th Cir. 2006) (stating that "[t]he first

rule in statutory construction is to determine whether the language at issue has a

---

[2] Williams also argues in passing that, because the indictment charged him with passing a false *and* fictitious instrument, the government was required to somehow prove that the fake checks in question were both "false" and "fictitious." However, "it is well-established . . . that a disjunctive statute may be pleaded conjunctively and proved disjunctively." *See United States v. Haymes*, 610 F.2d 309, 310 (5th Cir. 1980) (citing *United States v. Quiroz-Carrasco*, 565 F.2d 1328, 1331 (5th Cir. 1978)). This Court has adopted the binding precedent of the Fifth Circuit as it existed immediately prior to October 1, 1981. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

8

plain and unambiguous meaning with regard to the particular dispute" (internal quotations omitted)); *see also Smith v. United States*, 508 U.S. 223, 228, 113 S. Ct. 2050, 2054 (1993) (stating that undefined terms in a statute should be given their plain or ordinary meaning). Only when a statute's meaning is "inescapably ambiguous" will this Court turn to legislative history to aid in interpretation. *United States v. Veal*, 153 F.3d 1233, 1245 (11th Cir. 1998), *abrogated on other grounds by Fowler v. United States*, 131 S. Ct. 2045 (2011).

Williams contends that the terms "false" and "fictitious" have overlapping definitions in that both words can mean that something is outright untrue or imaginary, but can also mean that it is merely deceptive. Consequently, Williams argues that 18 U.S.C. § 514 is ambiguous, and asserts that referral to the statute's legislative history makes clear that the phrase "false or fictitious instrument, document, or other item" should be read to include only non-existent *types* of instruments, such as a three dollar bill or a wholly made-up type of government bond. According to Williams, he should have been charged under 18 U.S.C. § 513, which criminalizes the making or passing of counterfeited securities, and defines "counterfeited" as "a document that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety." 18 U.S.C. § 513.

We agree with the district court's conclusion that the language of 18 U.S.C. § 514(a) unambiguously applies to Williams's conduct. Though the terms "false"

and "fictitious" may have multiple meanings standing alone, their use within the context of § 514 makes clear that the statute applies to the passing of wholly fake checks such as the ones at issue here. *See Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1267 (11th Cir. 2006) (stating that "[t]he first step of statutory construction is to determine whether the language of the statute, *when considered in context*, is plain" (emphasis added)). The statute's use of the disjunctive "or" within the phrase "false or fictitious instrument" calls for some distinction to be made between a false instrument and a fictitious one. *See Brown v. Budget Rent-A-Car Sys., Inc.*, 119 F.3d 922, 924 (11th Cir. 1997) (stating that, "[a]s 'a general rule, the use of a disjunctive in a statute indicates alternatives and requires that those alternatives be treated separately'" (quoting *Quindlen v. Prudential Ins. Co. of Am.*, 482 F.2d 876, 878 (5th Cir. 1973))). Section 514's use of the disjunctive "or" indicates that the statute contemplates documents that are not "fictitious" since they purport to be a type of instrument that actually exists, but are still "false" in the sense that they are wholly inauthentic. To adopt Williams's preferred interpretation would be to render the term "false" mere surplusage as it is used in § 514.

The statutory definition of "security" also makes plain that § 514 allows for the prosecution of wholly fake checks such as those passed by Williams. Section 514 prohibits the passing or making of false or fictitious instruments purporting to

10

be an "actual security," and applies through reference a definition of "security" that includes checks. *See* 18 U.S.C. § 513(c). Thus, by its own language, § 514 extends to false documents purporting to be actual checks. To interpret § 514 to criminalize the passing of only non-existing *types* of documents would be to disregard the statutory definitions set forth by Congress in § 513(c), as it strains the imagination to think of a scenario where anything other than a document bearing the usual indicia of a personal check could purport to be an "actual" personal check.

Furthermore, even assuming that the checks passed by Williams were "counterfeited" securities and thus able to be prosecuted under § 513, nothing in either § 513 or § 514 requires that Williams's conduct be prosecuted exclusively under § 513. Indeed, it is common for a defendant's conduct to be subject to prosecution under different criminal statutes. *See Pasquantino v. United States*, 544 U.S. 349, 358 n.4, 125 S. Ct. 1766, 1773 n.4 (2005) ("The Federal Criminal Code is replete with provisions that criminalize overlapping conduct. The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." (internal citations omitted)); *United States v. Batchelder*, 442 U.S. 114, 123–25, 99 S. Ct. 2198, 2204–05 (1979) (stating that, unless motivated by inappropriate considerations such as race or religion, prosecutors are free to elect one criminal statute over another, even if the former statute bears harsher penalties for similar conduct).

11

It is undisputed that § 514 reaches conduct that § 513 does not, and that § 513 likewise criminalizes certain conduct that is not within the scope of § 514. Thus, Williams does not argue that § 513 would be rendered superfluous should § 514 also be interpreted to criminalize his conduct. Rather, Williams's argument is based solely on the purpose and legislative history of § 514 as it is discussed in two extra-circuit cases: *United States v. Howick*, 263 F.3d 1056 (9th Cir. 2001), and *United States v. Morganfield*, 501 F.3d 453 (5th Cir. 2007). Though the Court briefly examines each, neither provides a convincing basis for reversing Williams's convictions under § 514.

In *Howick*, the defendant was convicted under § 514 for possessing fake "federal reserve notes" in denominations of $100,000,000 and $500,000,000. The defendant argued on appeal that, because the notes in question were so obviously fake, he could not be convicted under § 514 of possessing a false or fictitious instrument purporting to be an *actual* security or other financial instrument. *Howick*, 263 F.3d at 1066. Rather, the defendant argued that § 514 should be read to include a "threshold requirement" with respect to the believability of the false instrument at issue: if the purported obligation was so obviously fake that no reasonable person would be fooled into thinking it was an "actual" financial instrument, then the defendant's possession of that instrument could not constitute a violation of § 514, regardless of the defendant's fraudulent intent.

12

The Ninth Circuit affirmed the appellant's conviction. *Id.* at 1067–68. In doing so, the court relied heavily on the legislative history of § 514, finding that the purpose of the statute was to criminalize certain fraudulent instruments that then-existing federal counterfeiting laws did not reach:

> This legislation combats the use of factitious [sic] financial instruments . . . . Because these fictitious instruments are not counterfeits of any existing negotiable instrument, Federal prosecutors have determined that the manufacture, possession, or utterance of these instruments does not violate the counterfeit or bank fraud provisions . . . . This bill makes it a violation of Federal law to possess, pass, utter, publish, or sell, with intent to defraud, any items purporting to be negotiable instruments of the U.S. Government . . . . or a private entity. It closes a loophole in federal counterfeiting law.

*Id.* at 1066–67 (quoting 141 Cong. Rec. S9533-34). Considering the legislative intent, the court decided not to impose a stringent standard concerning the statute's "actual" qualifier, holding that a false or fictitious document purported to be an "actual" instrument under § 514 so long as it bore "enough of the various hallmarks and indicia of financial obligations so as to appear . . . a member of a family of 'actual . . . financial instrument[s]' in general." *Id.* at 1068.

The *Howick* court's holding—addressing the standard for when a false document purports to be an "actual" instrument under § 514—has nothing to do with the issue before this Court. Still, Williams seizes upon a distinction that the *Howick* court drew in dicta while discussing the legislative intent behind § 514.

After noting that the stated purpose for § 514 was to close "a loophole in federal counterfeiting law," the court stated that:

> The distinction that emerges is this: A "counterfeit" obligation is a bogus document contrived to appear similar to an existing financial instrument; a "fictitious" obligation is a bogus document contrived to appear to be a financial instrument, where there is in fact no such genuine instrument . . . .

*Id*. at 1067.

Williams argues that, by making such a distinction, the Ninth Circuit effectively limited prosecution under § 514 to the making or passing of documents purporting to be a type of financial instrument that in fact does not exist. However, as has been discussed, the plain language of § 514 criminalizes Williams's conduct. Thus, there is no need for this Court to consult the statute's legislative history. *See Shockley v. Comm'r of IRS*, 686 F.3d 1228, 1235 (11th Cir. 2012) ("[I]f the statute's language is clear, there is no need to go beyond the statute's plain language into legislative history.").

Furthermore, Williams's argument fails even if this Court were to consider § 514's legislative history. While the legislative history discussed in *Howick* may indicate that § 514 was intended to "close a loophole" in federal counterfeiting law, there is nothing in the legislative history to suggest that the use of § 514 was intended to be limited *solely* to instances where the defendant's conduct fell within that loophole. *See, e.g.*, *United States v. Anderez*, 661 F.2d 404, 407 (5th Cir. Unit

14

B 1981) (refusing to find that the criminal statute at issue in that case was the "sole source of punishment" for the defendant's conduct, and remarking that "only the starkest manifestation of contrary intent in the legislative history" could justify an alternative outcome).[3] Finally, even if the Court were to take *Howick*'s legislative history-derived distinction at face value, the fake checks at issue would still be "false or fictitious" under § 514. As Williams's counsel conceded during oral argument, at least four of the five fake checks in question are not copies of any existing check, but instead purport to be drawn from one account while containing the routing/account numbers for a different account. Of course, no existing authentic checks actually contain the combination of account holder's name and account/routing number that appears on these fake checks. In other words, Williams's phony checks are, to borrow from *Howick*, "bogus document[s] contrived to appear to be a financial instrument, *where there is in fact no such genuine instrument* [in existence]." *Howick*, 263 F.3d at 1067 (emphasis added).[4]

Williams also points to *United States v. Morganfield*, a case in which the Fifth Circuit, relying in part on *Howick*, suggested that there was a difference between a "counterfeit" or "forged" check under 18 U.S.C. § 513 and a "false or

---

[3] Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit, regardless of the date of issuance. *See Kirchman v. Comm'r of IRS*, 862 F.2d 1486, 1491 n.9 (11th Cir. 1989) (citing *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982)).

[4] Furthermore, the one check (Count Four) bearing both the Gelmans' name and their account/routing number was "clearly fake," according the district court judge who inspected both during the bench trial. *See* Doc. 94, at 4 n.4.

15

fictitious" check under 18 U.S.C. § 514. *See Morganfield*, 501 F.3d at 453. In

*Morganfield*, the defendants appealed after being convicted under § 514 for

passing fraudulent checks. The defendants used fake registration documents to

obtain a d/b/a certificate for a non-existent business, and then used the certificate to

open, with a small initial deposit, a checking account in the shell company's name.

The defendants then proceeded to pass a series of worthless checks from the shell

company's account. In deciding whether the passing of these fraudulent checks

could be prosecuted as a violation of § 514, the court emphasized that the checks at

issue, while worthless and used to further a larger scheme of fraud, were

nevertheless "genuine" in the sense that they had been issued under the authority of

a bank. Consequently, the Fifth Circuit refused to find that the checks were "false

or fictitious instruments." *Id*. at 460. Even though the court's holding was limited

to the issue of whether legitimately issued checks could be considered "false or

fictitious instruments" under § 514, the court cited with approval *Howick*'s

analysis of the distinction between "false or fictitious" and "counterfeit"

documents, ultimately stating that § 514 "prohibits the use of a not real or

imaginary type of instrument that purports to be an existing type of security." *Id*. at

459–60.

Williams argues that this Court should adopt the Fifth Circuit's analysis in

*Morganfield*, and thus conclude that the fraudulent checks passed by Williams

16

were not "false or fictitious instruments" under 18 U.S.C. § 514. In making this argument, Williams ignores that the *Morganfield* court expressly stated that its holding did not contemplate conduct similar to that which serves as the basis for Williams's convictions (i.e., the production of wholly fake checks):

> The actions of [the defendants] and their co-conspirators are plainly illegal; however . . . the government charged [the defendants] under the wrong section. The checks in this case were, on their face, genuine. The checks were actual negotiable instruments that were issued by legitimate banks where actual checking accounts existed. [Defendants'] subsequent actions may well have created "forged" or "counterfeit" obligations [under § 513], but their actions did not turn otherwise "real" checks into a "nonexistent" type of security. *This is not to say that a scheme that involves wholly fake "checks" necessarily falls outside § 514(a); we conclude only that, where the underlying instruments are facially genuine checks, § 514(a) is not applicable*.

*Id*. at 460–61 (emphasis added). Thus, other than citing with approval the *Howick* dicta concerning the difference between "fictitious" and "counterfeit" instruments, *Morganfield* does little to support Williams's position. In fact, *Morganfield* can be read to imply that prosecution under § 514 is appropriate with respect to Williams's conduct, as the Fifth Circuit went to great lengths to distinguish the checks at issue in that case (facially genuine, but used in a fraudulent scheme) from wholly fabricated "checks" like those in the instant case.

In sum, the plain language of § 514 criminalizes Williams's conduct, and neither *Howick* nor *Morganfield* provides a convincing basis for holding otherwise. Similarly, the rule of lenity does not require this Court to forego a common-sense

17

reading of § 514 in favor of a more narrow interpretation. *See United States v. Sepulveda*, 115 F.3d 882, 887 n.11 (11th Cir. 1997) (stating that the rule of lenity "has no application where the fair meaning of [a criminal] statute is clear"); *see also id*. at 887 (stating that a court has no obligation to "override common sense and evident statutory purpose" when interpreting a provision in a criminal statute (internal quotations omitted)). Accordingly, Williams's convictions (Counts 1–5) for violating 18 U.S.C. § 514 were supported by sufficient evidence and as such are due to be affirmed.[5]

### B. Unauthorized Use of an "Access Device" Under 18 U.S.C. § 1029

Williams argues that his conduct was insufficient to support a conviction under 18 U.S.C. § 1029, which, in relevant part, criminalizes the conduct of a defendant who "knowingly and with intent to defraud effects transactions, with 1 or more access devices issued to another person or persons, to receive payment or any other thing of value . . . the aggregate value of which is equal to or greater than $1,000." 18 U.S.C. § 1029(a)(5). At issue specifically is whether Williams's conduct—i.e., using the Gelmans' account number to effect online transactions— amounts to use of an "access device." The term "access device" is defined in 18 U.S.C. § 1029(e)(1):

---

[5] Williams also argues that the district court constructively amended the indictment as to Counts 1–5 by impermissibly expanding the basis for conviction beyond the scope of § 514. However, such an argument is merely a re-packaging of Williams's sufficiency of the evidence argument, since both depend entirely on whether the district court erred when interpreting the "false or fictitious" language found in § 514.

18

> [T]he term "access device" means *any* card, plate, code, *account number*, electronic serial number, mobile identification number, personal identification number, or other . . . means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument) . . . .

18 U.S.C. § 1029(e)(1) (emphasis added).

As emphasized above, the definition of "access device" plainly includes account numbers, and the modifier "any" leaves little doubt that routing/bank account numbers fall within the ambit of § 1029. However, Williams points to the language that excludes from the statute's scope those transfers originating "solely by paper instrument." Williams argues that, because the account number he used to effectuate the transactions at issue can be found at the bottom of an ordinary check, which is a "paper instrument," his conduct does not support a conviction under § 1029(a)(5).

In making this argument, Williams relies heavily on *United States v. Tatum*, 518 F.3d 769 (10th Cir. 2008). In *Tatum*, the Tenth Circuit reversed the imposition of a sentencing enhancement that was based on the defendant's use of an "access device" when passing counterfeit checks. In reaching its conclusion, the Tenth Circuit stated that:

19

> The statutory definition of "access devices" unambiguously excludes "transfer[s] originated solely by paper instrument," which is precisely the conduct involved in Defendant's offense. *The government introduced no evidence that Defendant used, possessed, produced, or trafficked in bank account numbers in any way except as part of his scheme to pass counterfeit checks.* We therefore conclude that both the counterfeit checks and the account numbers printed on those checks fall outside the statutory definition of an access device.

*Id.* at 772 (emphasis added).

Williams cites *Tatum* as support for the position that, because bank account numbers can be found on ordinary paper checks, such account numbers are not "access devices" under § 1029(e)(1). However, Williams ignores that the *Tatum* court's holding was expressly conditioned on the fact that the government offered no evidence that the defendant used the bank account numbers at issue in any way other than through the passing of counterfeit checks. As the district court here correctly noted, Williams's situation is distinguishable since his fraudulent transfers originated *electronically* via the internet. At no point during the online transactions at issue was a paper check issued, created, or exchanged. As such, Williams's conduct falls outside § 1029's narrow exception for "transfer[s] originat[ing] solely by paper instrument," and his conviction under 18 U.S.C. § 1029 is due to be affirmed.

## C.  *"Failure to Appear" Under 18 U.S.C. § 3146*

Finally, Williams challenges the sufficiency of the evidence supporting his conviction for "failure to appear." Williams argues that his violation of the terms

20

of his supervised release was not a sufficient predicate offense to support his "failure to appear" conviction under 18 U.S.C. § 3146. Section 3146(a) states that "[w]hoever, having been released under this chapter, knowingly fails to appear before a court as required by the conditions of release . . . shall be punished as provided in subsection (b) of this section." 18 U.S.C. § 3146(a). Section 3146(b) does not contain fixed terms of imprisonment, but instead lays out a graduated table that correlates to the maximum penalties for the underlying offense(s):

> (b) Punishment.—(1) the punishment for an offense under this section is—
>
>> (A) if the person was released in connection with a charge of, or while awaiting sentence, surrender for service of sentence, or appeal or certiorari after conviction for—
>>
>>> (i) an offense punishable by death, life imprisonment, or imprisonment for a term of 15 years or more, a fine under this title or for not more than ten years, or both;
>>>
>>> (ii) an offense punishable by imprisonment for a term of five years or more, a fine under this title or imprisonment for not more than five years, or both . . . .

18 U.S.C. § 3146(b).

Williams asserts that a violation of supervised release terms is not an "offense" as the term is used in § 3146(b), and that § 3146 therefore does not apply to his conduct. The government concedes that a supervised release violation is not

21

an "offense" as the term is used in the statute,[6] but correctly points out that § 3146 allows for punishment if the person was released "in connection with" any relevant criminal offense. Thus, the government argues that the "offense[s]" in question are Williams's underlying convictions for check fraud and credit card fraud for which he was on supervised release in the first place.

We agree with the district court that Williams's arguments are without merit. Even assuming, as Williams argues, that § 3146(a) does require reference to § 3146(b) to determine whether a defendant's conduct is sufficient to support a conviction for failure to appear, Williams's argument is misguided. The language of § 3146(b) makes plain that the "offense" in question is the underlying conviction that led to the defendant's supervised release. Williams's release following his arrest for the violation of the terms of his supervised release was "in connection with" his earlier federal convictions for credit card fraud and check fraud, as the supervised release terms were part of the same sentence imposed upon him for those convictions. *See United States v. Smith*, 500 F.3d 27, 32 (1st Cir. 2007) (stating that "[t]he language that Congress chose ('if the person was released in connection with a charge of'), by its plain terms, applies to an individual on supervised release in connection with the charge underlying the supervised release").

---

[6] See *United States v. Phillips*, 640 F.3d 154, 157–58 (6th Cir. 2011), for a concise discussion as to why a supervised release violation does not count as an "offense" under § 3146(b).

Admittedly, the "offense" in question will most often be the more immediate criminal charge that caused the defendant's arrest, release, and the setting of a court date. However, common sense dictates that, in situations where the defendant was released pending a hearing on a violation of supervised release, the "offense" referenced in § 3146(b)(1)(A)(i) and (ii) is the *original* conviction, as the period of supervised release is simply part of the sentence for the underlying conviction. Such a conclusion is in line not only with the plain language of the statute, but also with the more general principle that post-revocation penalties are contemplated in relation to the original offense. *See Johnson v. United States*, 529 U.S. 694, 701, S. Ct. 1795, 1801 (2000). Indeed, every circuit that has considered the language at issue in § 3146(b) has decided the matter similarly. *See United States v. Jensen*, 705 F.3d 976, 979 (9th Cir. 2013) (stating in the sentencing context that it is the original conviction that counts as the "offense" under § 3146(b), not the subsequent violation of the terms of supervised release); *United States v. McIntosh*, 702 F.3d 381, 387–88 (7th Cir. 2012) (rejecting the appellant's contention that, because a supervised release violation is not an "offense" under § 3146(b), "no punishment option exists" under § 3146 for its violation); *see also Phillips*, 640 F.3d at 158–59; *Smith*, 500 F.3d at 32.[7] Accordingly, Williams's conviction under 18 U.S.C. § 3146 is due to be affirmed.

---

[7] The Court notes that some of these cases concern defendants that, in an effort to secure a

## IV.    Conclusion

Williams does not dispute that he committed the acts that serve as the basis for his convictions. Having decided that the district court did not err when interpreting the criminal statutes at issue, we find that there is sufficient evidence supporting Williams's convictions. We thus affirm Williams's convictions.

**AFFIRMED.**

---

shorter sentence, argued that a violation of supervised release terms *is* an "offense" under § 3146(b). However, the analysis of the "in connection with" and "offense" language in § 3146 found in these cases is instructive.