[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-11951

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

STEVEN SCHRECK,
a.k.a. Eugene Sandburg,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:23-cr-14042-AMC-1

_____

Before WILLIAM PRYOR, Chief Judge, and GRANT and LUCK, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to determine whether sufficient evidence supports convictions for using a passport obtained by a false statement and for making a false statement in an application for a passport. *See* 18 U.S.C. § 1542. In 1977, Steven Schreck escaped from an Oregon prison and assumed the identity of a deceased man, Eugene Sandburg. Schreck acquired a passport using Sandburg's identity that same year. And, in later decades, Schreck used some of Sandburg's information as his own whenever he renewed his passport. In 2021, Schreck provided only his own identifying information in his application for passport renewal, but Schreck also submitted his passport from 2011—which listed Sandburg's identifying date and location of birth as his own—with his application. And he certified that he had not "made false statements or included false documents in support of this application." After a grand jury indicted Schreck for using a passport obtained by a false statement and for making a false statement in a passport application, a jury convicted him on both counts. The district court sentenced him to 12 months of probation. Because sufficient evidence supports both convictions, we affirm.

## I. BACKGROUND

Steven Schreck was born on December 7, 1946, in Newark, New Jersey. In 1977, Schreck escaped from an Oregon prison following his convictions for burglary and transporting forged

securities. He initially fled to Kansas. After he saw a death notice in a local newspaper for Hervey Eugene Sandburg, Schreck decided to adopt Sandburg's identity for himself. Posing as Sandburg, Schreck went to an office of the Kansas Department of Motor Vehicles, stated that he had lost his wallet, and received a temporary driver's license.

Schreck moved to Michigan later that year. Still posing as Sandburg, he provided an office of the Michigan Department of State with the temporary license he received in Kansas and requested a Michigan driver's license. The Department fulfilled his request. With this license in hand, Schreck began working and accumulated paperwork in Sandburg's name. In effect, he "started living life again under the name Her[vey] Sandburg."

That same year, Schreck also met his wife in Michigan. They bought a house and started raising a family together. Later that year, Schreck acquired a passport so that he could travel with her. To do so, Schreck "filled out the application with the information that [he] had from Her[vey] Eugene Sandburg." He received a passport in Sandburg's name.

In 1983, Schreck was arrested for his escape from prison. He served six months of imprisonment and was then released on five years of probation. Despite being caught, Schreck kept using Sandburg's name because it was his wife's married name and the name of their children.

In 1988, Schreck renewed his passport. Although he kept almost all the information the same, he dropped Hervey from his

name and left it as just Eugene Sandburg. Later that year, Schreck legally changed his name to Eugene Sandburg. In the early 1990s, Schreck updated the name associated with his social security number so that his original number matched his new name of Sandburg.

In 1999, Schreck renewed his passport again. This time, he used his correct social security number instead of Sandburg's. The Department of State never contacted him about this discrepancy. And he continued to use Sandburg's birthday of June 7, 1944, and birth location of Kansas City. In 2011, Schreck renewed his passport without making any new changes.

In 2021, Schreck corrected the remaining false information in his passport. He listed his birth date and location and stated that his birth name was Steven Schreck in his passport renewal application. He also submitted his 2011 passport, as required to renew by mail using the Form DS-82 application. The application warned that "[f]alse statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under U.S. law." Schreck certified that "I have not knowingly and willfully made false statements or included false documents in support of this application."

In 2023, Special Agent Nasri Qurraa of the Diplomatic Security Service interviewed Schreck after his 2021 renewal application was flagged. During this interview, Schreck admitted to submitting the earlier passport applications with false information. But he

stated that, in his most recent application, he "wasn't lying, [he] was just trying to correct [his] mistakes."

Later that year, a federal grand jury indicted Schreck on two counts. *See* 18 U.S.C. § 1542. Count one charged him with using a passport obtained by a false statement for submitting his 2011 passport with his 2021 renewal application. Count two charged him with making a false statement in a passport application for certifying that he did not include any false documents in support of his 2021 renewal application.

Schreck moved to dismiss the indictment. On count one, he argued that he did not "use" his 2011 passport when he submitted it with his 2021 renewal application because the law requires passport holders to return their earlier passports when renewing them. On count two, he contended that his 2011 passport was not a "false document" because the Department of State issued it as an authentic document. The district court denied Schreck's motion.

At trial, the prosecution called three witnesses: Special Agent Qurraa; Aura Arauz-Figueroa, a fraud prevention manager for the Department of State; and Joseph Wisneski, a postal inspector. Special Agent Qurraa testified that passport renewal applicants are required to submit proof of their citizenship and identity and that a prior passport submitted with an application is "the proof that you are a citizen." Arauz-Figueroa testified that passports can be used for "identification purposes wherever identification is needed, to open a bank account, to register for school, for anything, for a job, anywhere where identification or proof of U.S.

citizenship is needed." She conceded that she did not "know if it explicitly says the passport is being use[d] for identification" on the Form DS-82 application. But she explained that "when you are doing renewal, you are renewing based on the fact that your identification and citizenship were already vetted." Wisneski testified that Schreck's 2021 renewal application was submitted from a post office within the Southern District of Florida.

At the close of the prosecution's case, Schreck moved for a judgment of acquittal. On count one, he contended that the evidence was insufficient for a jury to find that he had willfully and knowingly used a passport secured by a false statement. On count two, he argued that the evidence was insufficient for a jury to find that he had willfully and knowingly made a false statement in his passport application. He contended that the government failed to establish that "the 2011 passport was a false document." The district court denied Schreck's motion.

Schreck testified in his own defense. He described his background and experiences applying for and renewing his passports. He stated that he "[m]ost definitely" cared about correcting his information when he submitted his 2021 renewal application. And he testified that he "wasn't trying to defraud anybody." After this testimony, Schreck renewed his motion for judgment of acquittal "for the same reasonings as before." The district court denied this motion again.

The jury convicted Schreck on both counts. The district court sentenced him to serve 12 months of probation.

## II. STANDARD OF REVIEW

We review matters of statutory interpretation *de novo*. *United States v. Shamsid-Deen*, 61 F.4th 935, 946 (11th Cir. 2023). We also review challenges to the sufficiency of the evidence *de novo*. *United States v. Flores*, 572 F.3d 1254, 1262 (11th Cir. 2009). And we "view[] the evidence in the light most favorable to the government and draw[] all reasonable inferences and credibility choices in the government's favor." *Id.* We will refuse to overturn a conviction "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Grow*, 977 F.3d 1310, 1320 (11th Cir. 2020) (citation and internal quotation marks omitted).

## III. DISCUSSION

Schreck "frames his argument as one challenging the sufficiency of the evidence supporting his convictions." *United States v. Williams*, 790 F.3d 1240, 1244 (11th Cir. 2015). But "this appeal turns on matters of statutory interpretation, as he argues that, under the 'correct' interpretation of the relevant criminal statute[], the government failed to offer sufficient evidence to convict him." *Id.* To determine whether sufficient evidence supports Schreck's convictions, we must interpret the text of the governing statute, 18 U.S.C. § 1542, against the evidentiary record.

We divide our discussion into two parts. First, we explain that sufficient evidence supports Schreck's conviction for "willfully and knowingly us[ing]" a passport secured by a false statement. *Id.* Second, we explain that sufficient evidence also supports Schreck's

conviction for "willfully and knowingly mak[ing]" a "false statement" in a passport application. *Id.*

### A. Sufficient Evidence Supports Schreck's Conviction on Count One.

Schreck argues that the prosecution failed to prove his *actus reus* and *mens rea* for count one beyond a reasonable doubt. The second paragraph of section 1542 prohibits "willfully and knowingly us[ing] or attempt[ing] to use . . . any passport the issue of which was secured in any way by reason of any false statement." *Id.* We address in turn his contentions that he did not "use" his 2011 passport when he submitted it with his 2021 renewal application and that any such "use" was not "willful[] and knowing[]." *Id.*

### 1. Schreck "Used" His 2011 Passport When He Submitted It with His Renewal Application.

Schreck contends that he did not "use" his passport within the meaning of section 1542. Under principles of statutory interpretation, "we look to the plain and ordinary meaning of the statutory language as it was understood at the time the law was enacted." *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021). "[O]ne of the ways to figure out that meaning is by looking at dictionaries in existence around the time of enactment." *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1026 (11th Cir. 2016).

Contemporaneous dictionaries suggest that the term "use" had an expansive meaning when section 1542 was enacted. *See* Act of June 25, 1948, Pub L. No. 80-772, § 1542, 62 Stat. 683, 771. Dictionaries from that era establish that "use" meant "[t]o employ for

the accomplishment of a purpose," "[t]o put into practi[c]e or employ habitually," "[t]o conduct oneself toward," and "[t]o make familiar by habit or practi[c]e." *Use*, 2 FUNK & WAGNALLS NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE (1943); *accord Use*, WEBSTER'S NEW COLLEGIATE DICTIONARY (1951) (defining "use" as "to avail oneself of," "to employ," "[t]o behave toward," and "[t]o partake of"). These definitions suggest that the term "use" in section 1542 covered a broad range of conduct, including where someone employs a passport to accomplish a purpose. As the Supreme Court has recognized, "although not without limits, the word 'use' is 'expansive.'" *Smith v. United States*, 508 U.S. 223, 229 (1993) (quoting *United States v. Long*, 905 F.2d 1572, 1576–77 (D.C. Cir. 1990) (Thomas, J.)).

Schreck contends that we should apply a narrower meaning of the term. He cites the Supreme Court's interpretation of the predecessor to section 1542 in *Browder v. United States* to argue that the statute only covers the "use" of a passport "in travel." 312 U.S. 335, 342 (1941). And he contends that precedents interpreting "use" in other statutory contexts make clear that "use" requires "active, non-ancillary employment." The government responds that neither precedent nor the statutory context limits section 1542 to these narrow subsets of uses.

The government has the better argument. *Browder* confirmed that the ordinary meaning of "use" governs. There, the Supreme Court interpreted the predecessor statute to address "whether the use by an American citizen of a passport obtained by

false statements to facilitate reentry into the United States is a 'use' within [the statute]." *Id.* at 335 & n.1 (quoting Act of June 15, 1917, Pub. L. No. 65-24, § 2, 40 Stat. 217, 227). It held that providing a passport to reenter the United States constituted a covered "use." *Id.* at 338–40. In reaching this conclusion, the Court stated that even though "passports are used chiefly in foreign travel," "[t]here is no limitation . . . to that field." *Id.* at 338. And it suggested that the ordinary meaning of "use" is capacious. *Id.* at 338–40.

Schreck's contention that *Browder* enshrined a bright-line rule that the statute covers only travel-related uses overreads the Court's holding. *Browder* established that using a passport "in travel" constitutes one "use" covered by the statute. *Id.* at 338–40, 342. Although the Court used the phrase "only those 'uses in connection with travel which are a part of the ordinary incentives for obtaining passports'" when analyzing the statute's coverage, it did so for the purpose of describing the government's position—not as a statement of the law. *Id.* at 338. Schreck's citations to other lines in *Browder* that suggest that "use" might have a narrower meaning, *see, e.g.*, *id.* at 338, 342 (discussing the use of a passport "to prove citizenship on reentry" and "in travel"), do not expand the Court's holding. And nothing in the statutory text supports a travel-based limitation.

Schreck also cites precedents from other statutory contexts. He cites *Dubin v. United States* to argue that the submission of a prior passport to receive a new one is an ancillary "use" not covered by section 1542. 143 S. Ct. 1557 (2023). In interpreting

section 1028A(a)(1), the Court concluded in *Dubin* that "[a] defendant 'uses' another person's means of identification 'in relation to' a predicate offense when this use is at the crux of what makes the conduct criminal." *Id.* at 1573 (quoting 18 U.S.C. § 1028A(a)(1)). Schreck also cites *Leocal v. Ashcroft*, 543 U.S. 1 (2004); *Jones v. United States*, 529 U.S. 848 (2000); and *Bailey v. United States*, 516 U.S. 137 (1995), to contend that his submission of the 2011 passport at the direction of a form is a passive "use" not covered by section 1542. *Leocal* held that a conviction for driving under the influence is not a "crime of violence" under section 16(a) because a crime with a *mens rea* of negligence does not amount to a "'use . . . of physical force against the person or property of another.'" 543 U.S. at 8–10 (emphasis omitted) (quoting 18 U.S.C. § 16(a)). *Jones* ruled that "'used'" in the federal arson statute "mean[s] active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." 529 U.S. at 855 (quoting 18 U.S.C. § 844(i)). And *Bailey* held that "'uses'" in section 924(c)(1) requires "*active employment* of the firearm." 516 U.S. at 142–43 (quoting 18 U.S.C. § 924(c)(1)).

These precedents do not help Schreck's cause. To start, differences between the statutory text in those decisions and section 1542 limit their applicability. *Dubin*, for example, focused on the words surrounding "'use'" in section 1028A(a)(1) like "'in relation to'" and the "neighboring verbs" of "'transfers'" and "'possesses'" to conclude that the statute covers only uses of identifying information at the crux of identity theft. 143 S. Ct. at 1566–67, 1569–71 (quoting 18 U.S.C. § 1028A(a)(1)). But Section 1542

12                    Opinion of the Court                    24-11951

contains no comparable text that limits the meaning of "use." Indeed, these decisions bolster the conclusion that the term "use" in section 1542 covers Schreck's conduct. On *Dubin*'s own terms, Schreck's submission of his 2011 passport with his 2021 renewal application was not an "ancillary use[]." *Id*. at 1566. Applicants *must* provide their prior passports with the Form DS-82 application when they renew by mail. Because Schreck used his 2011 passport to meet this requirement, this "use" was "at the crux of the criminality." *Id*. at 1567. And *Leocal*, *Jones*, and *Bailey* also support affirmance. Schreck testified that he "[m]ost definitely" cared about correcting his information when he submitted his 2021 renewal application. He intentionally mailed—and thereby "actively employ[ed]"—his 2011 passport to satisfy the application requirements. *Leocal*, 543 U.S. at 9. This conduct was "a use that makes the [passport] an operative factor in relation to the . . . offense." *Bailey*, 516 U.S. at 143.

For all these reasons, the term "use" in section 1542 covers the submission of a prior passport for identification purposes in a renewal application. In other contexts, we have recognized that a passport can be "used to establish legal presence or proof of citizenship." *See, e.g.*, *United States v. Doe*, 661 F.3d 550, 558 (11th Cir. 2011). Because Schreck's 2011 passport was the only document that could satisfy the first requirement of the DS-82 application, his submission of it to verify his identity and citizenship constituted a "use" covered by the ordinary meaning of the statute. Like the Supreme Court in *Browder*, we need not decide the outer bounds of the meaning of "use" to affirm Schreck's conviction because "[t]he

use here charged . . . was clearly within the scope of the act." 312 U.S. at 340. And Schreck's invocation of lenity does not change our interpretation because "the rule of lenity does not require this Court to forego a common-sense reading of [section 1542] in favor of a more narrow interpretation." *Williams*, 790 F.3d at 1249.

Sufficient evidence supports the jury's finding that Schreck "use[d]" his 2011 passport in violation of section 1542 when he submitted it with his 2021 renewal application. Schreck admitted that he included the passport with his renewal application. Arauz-Figueroa, a fraud prevention manager with the Department of State, testified that passports can be used for "identification purposes." And Special Agent Qurraa made clear that a prior passport is used to prove identity and citizenship when submitted with a renewal application. The jury was free to credit this testimony and find that Schreck "use[d]" his 2011 passport when he sent it in with his 2021 renewal application. *See Flores*, 572 F.3d at 1263.

### 2. Schreck's Use of His 2011 Passport Was "Willful and Knowing."

Schreck also contends that there is insufficient evidence that he knew that the passport was required for proof of identity and citizenship. The second paragraph of section 1542 imposes a *mens rea* requirement of "willfully and knowingly." 18 U.S.C. § 1542. The government responds that Schreck's intent is immaterial because the crime was complete when he purposefully submitted a passport that he knew to be secured by false statements with his renewal application.

The government has the better argument. In *Browder*, the Supreme Court explained that "the statute plainly does not purport to punish fraudulent or dishonest use other than such as is involved in the use of a passport dishonestly obtained." 312 U.S. at 340–41. It stated that "[n]one of [the statute's] words suggest that fraudulent use is an element of the crime" so "[t]he crime of 'use' is complete when the passport so obtained is used willfully and knowingly." *Id.* at 341. It defined "willfully and knowingly" as "deliberately and with knowledge and not something which is merely careless or negligent or inadvertent." *Id.* (internal quotation marks omitted). And it held that "[o]nce the basic wrong under this passport statute is completed, that is the securing of a passport by a false statement, any intentional use of that passport . . . is punishable." *Id.* at 342.

We have addressed *Browder* only twice before, but both decisions provide guidance about the mental state required by section 1542. In *United States v. O'Bryant*, we extended *Browder*'s holding on *mens rea* to the first paragraph of section 1542. 775 F.2d 1528, 1535 (11th Cir. 1985). And, in *United States v. Phillips*, we cited *Browder* as an example of "courts . . . interpret[ing] 'willfully' as requiring a finding of general intent, meaning the intent to engage in the prohibited conduct; that is, acting voluntarily, knowingly, and intentionally, and not accidently or mistakenly." 19 F.3d 1565, 1576 (11th Cir. 1994). We explained that, under this interpretation of "willfully," "a defendant need not intend to violate the law to commit a general intent crime, but he must actually intend to do the act that the law proscribes." *Id.* at 1576–77.

These precedents confirm that Schreck "willfully and knowingly" used his passport in violation of section 1542. After Schreck made false statements to secure his 2011 passport, his "intentional use of that passport" by submitting it with his 2021 renewal application was "punishable." *Browder*, 312 U.S. at 342. Because Schreck testified that he intentionally sent in his 2011 passport to acquire a new passport, the jury reasonably concluded that this use was "not something which is merely careless or negligent or inadvertent." *Id.* at 341 (internal quotation marks omitted). After all, he stated that his motivation for renewing the passport was "trying to correct" the falsities in his 2011 passport. Sufficient evidence supports Schreck's conviction on count one.

### B. Sufficient Evidence Supports Schreck's Conviction on Count Two.

Schreck also argues that the government failed to prove his *actus reus* and *mens rea* for count two beyond a reasonable doubt. The first paragraph of section 1542 penalizes anyone who "willfully and knowingly makes any false statement in an application for [a] passport with intent to induce or secure the issuance of a passport . . . contrary to the laws regulating the issuance of passports or the rules prescribed pursuant to such laws." 18 U.S.C. § 1542. We address in turn his contentions that "false documents" as used in the passport renewal application covers only inauthentic documents and that any false statement he made in the certification was not "willful[] and knowing[]." *Id.*

### 1. Schreck Made a "False Statement" When He Certified that He Did Not Include Any "False Documents" in His Renewal Application.

Schreck's liability under count two hinges on the interpretation of the term "false documents" in the Form DS-82 application for renewal of a passport. Section 1542 prohibits the "mak[ing] [of] any false statement in an application for [a] passport." *Id.* The renewal application requires an applicant to certify that "I have not knowingly and willfully made false statements or *included false documents* in support of this application." Schreck signed this certification even though he submitted his 2011 passport—which he knew to contain a false birth date and location—with his 2021 renewal application. Because Schreck did not make any false statements on the application itself, the prosecution's theory of liability under the first paragraph of section 1542 was that the 2011 passport constituted a "false document."

Our reading of the renewal application turns on the meaning of its use of the term "false." The parties agree that "false" has two potential meanings: "[u]ntrue" and "inauthentic." *False*, Black's Law Dictionary (12th ed. 2024). Schreck contends that "false" means only inauthentic in this context. He argues that his 2011 passport was not a "false document" because it was an authentic passport issued by the government. The government responds that "false" means both inauthentic and untrue. It contends that other contextual evidence in the renewal application supports its broader interpretation and that it would be illogical to treat a

counterfeit passport differently than a passport containing untrue information.

As the Supreme Court has explained, "the meaning of language is inherently contextual." *Moskal v. United States*, 498 U.S. 103, 108 (1990); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 2, at 56 (2012) ("Of course, words are given meaning by their context . . . ."). And "[w]ords that can have more than one meaning are given content . . . by their surroundings." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 466 (2001). So, "to determine the meaning of [false documents], we must consider the context in which [the term] is used." *United States v. Zuniga-Arteaga*, 681 F.3d 1220, 1224 (11th Cir. 2012).

The passport renewal application makes clear that the term "false documents" covers both inauthentic and untrue documents. The renewal application employs "false" as an adjective to modify both "statements" and "documents." Notably, "[a] word . . . is presumed to bear the same meaning throughout a text." SCALIA & GARNER, READING LAW § 25, at 170; *accord Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019). And Schreck concedes that "false statements" encompasses untrue statements. *See Statement*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "false statement" as "[a]n *untrue* statement knowingly made with the intent to mislead" (emphasis added)). It would make no sense to say that "false" as used in "false statements" means untrue but "false"

as used in "false documents" four words later does not also mean untrue.

A separate warning on the renewal application expressly flags the illegality of false statements made in documents submitted with an application. The renewal application contains an "unambiguous warning" that "'[f]alse statements made knowingly and willfully in passport applications, *including affidavits or other documents submitted to support this application*, are punishable by fine and/or imprisonment.'" *Doe*, 661 F.3d at 553 (emphasis added). "False documents," when read in conjunction with this warning that explicitly mentions "[f]alse statements made [in] . . . other documents submitted to support this application," covers documents that are untrue because they contain false statements.

Schreck contends that the renewal application is concerned only with authentic documents because the instructions for submitting a marriage certificate—the only other type of document that can be submitted with a Form DS-82 application (to prove a name change)—require a "certified copy" and prohibit "photocopies." But the instructions for marriage certificates have minimal bearing on how to interpret "false documents." It makes sense that the Department of State would demand a "certified copy" of a marriage certificate because—unlike for prior passports—it was not the entity that issued it. And that no such terminology concerned with authenticity appears in the section of the renewal application dedicated to prior passports betrays the weakness of this argument.

Schreck asserts that the instructions for submitting a photograph also highlight the renewal application's focus on authenticity because they require an applicant to certify that his picture is a *"genuine*, current photograph." But his reliance on this requirement is unpersuasive for similar reasons as the instructions for marriage certificates. That language about authenticity appears elsewhere in the application but not in the section about prior passports again suggests, if anything, that concerns about prior passports extended beyond mere inauthenticity. In addition, photographs—unlike passports—ordinarily do not contain statements that might be false. So it makes sense that these instructions focus on only authenticity.

Schreck also argues that providing untrue information is covered separately because the certification prohibits both "ma[king] false statements or includ[ing] false documents." But this contention overlooks the different verbs acting on "false statements" versus "false documents." "[M]ade false statements" covers information *provided on* the application forms, whereas "included false documents" covers documents *submitted with* the application. The prohibition on "[m]ak[ing] false statements" in the application itself does not necessarily implicate false statements within documents attached to an application. The bar on "includ[ing] false documents" must cover untrue documents to capture these kinds of falsities.

Because "false documents" covers untrue documents, sufficient evidence supports the jury's finding that Schreck made a

"false statement" in violation of section 1542 when he signed the certification on the 2021 passport renewal application. Schreck's 2011 passport listed a false birth date and location. He included that passport with his renewal application and certified that he had not included any "false documents." Based on these facts and the surrounding context in the renewal application, the jury reasonably found that Schreck made a "false statement" because his 2011 passport was a "false document."

2. Schreck's "False Statement" Was "Willful and Knowing."

Sufficient evidence establishes that Schreck made the certification "willfully and knowingly" in violation of section 1542. 18 U.S.C. § 1542. The first paragraph of section 1542 requires the same *mens rea* as the second paragraph. So our earlier discussion of "willfully and knowingly" with respect to count one applies with equal force to count two.

Because "[t]he crime is complete when one makes a statement one knows is untrue to procure a passport," the jury reasonably found that Schreck "willfully and knowingly" made a false statement in his 2021 passport renewal application when he intentionally certified that he had not included any "false documents." *O'Bryant*, 775 F.2d at 1535. Schreck knew that his 2011 passport contained false information. Yet he still intentionally signed the certification and affirmed that he had not "included false documents" in his application. Based on this record, the jury reached a "reasonable interpretation[] of the evidence presented at trial" when it found that Schreck "willfully and knowingly" made a false

24-11951                Opinion of the Court                21

statement. *Flores*, 572 F.3d at 1263. Sufficient evidence supports Schreck's conviction on count two.

## IV. CONCLUSION

We **AFFIRM** Schreck's convictions.